**UNITED STATES of America, Plaintiff,**

v.

**James Whitaker TAFT and Steven Whitaker, Defendants.**

**Crim. A. File No. 90–81–01–02.**

United States District Court,
D. Vermont.

June 17, 1991.

David V. Kirby, Thomas D. Anderson, William B. Darrow, Asst. U.S. Attys., Burlington, Vt., for plaintiff.

William B. Gray, R. Jeffrey Behm, Sheehey Brue Gray & Furlong, Burlington, Vt., for defendant James Whitaker Taft.

Charles R. Tetzlaff, Latham, Eastman, Schweyer & Tetzlaff, Burlington, Vt., for defendant Steven Whitaker.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

PARKER, District Judge.

Defendants are charged with conspiracy to distribute and possess with intent to distribute a Schedule I controlled substance (marijuana) in violation of 21 U.S.C. §§ 841(a)(1), 846 (1988). The defendants are also charged with intentionally manufacturing marijuana and intentionally possessing with intent to distribute marijuana. 21 U.S.C. § 841(a)(1), (b)(1)(B) (1988); 18 U.S.C. § 2 (1951).

Before the court are seven motions. Defendant Whitaker moves to suppress post-

arrest statements. Defendant Taft moves: (1) to suppress post-arrest statements and physical evidence seized pursuant to a consent search; (2) to have his property returned pursuant to Federal Rules of Criminal Procedure 41(e); (3) to have a *Franks* hearing and to suppress evidence seized pursuant to a search warrant; (4) to bar the introduction of evidence relating to the number of plants at trial and at sentencing; (5) to sever his trial from that of Whitaker; and (6) to compel the government to disclose *Brady* evidence. Defendant Whitaker joins defendant Taft's motion to bar evidence relating to the number of plants.

On April 3 and 10, 1991, a hearing was held on the motions to suppress statements and physical evidence and for return of property pursuant to Rule 41(e). Both defendants testified, as well as Drug Enforcement Administration (hereinafter "DEA") Agents Thomas Doud and Sigmund Wutkiewicz (hereinafter "Ziggy"), and Stowe Police Officer Bruce Merriam. Since the other motions involve purely questions of law, they are decided without a hearing.

## FACTS

As a result of the hearing, the Court finds the following facts. On the morning of August 23, 1990, an arrest warrant issued for each defendant and a search warrant issued to search property in Montgomery, Vermont. Defendants arrived at the Montgomery property around noon of that day. Two state police cars were parked in the defendants' driveway. An unmarked police car pulled in behind the defendants.

As the defendants exited their truck, two plain clothed Stowe police officers got out of the unmarked police car and drew their guns. Transcript of Suppression Hearing, April 3, at 150-51 (hereinafter "T1" for April 3, and "T2" for April 10). The defendants were handcuffed and placed on the tailgate of their truck to await the arrival of the DEA agents. The defendants informed the police officers that behind the seat of the truck there were two unloaded

rifles and ammunition for the guns in a day pack. Two semiautomatic rifles were seized. DEA Agent Doud testified that the weapons were seized during an inventory of the vehicle, which was seized pursuant to 21 U.S.C. § 881(a)(4) because it was used to travel to the location where the defendants cultivated marijuana plants.[1] T1-32, 66. Alternatively, Doud testified on cross-examination that there was authority to seize the weapons in a search incident to an arrest as evidence of marijuana cultivation. T1-66.

An hour later, at about one o'clock p.m., DEA Agents Thomas Doud and Jeffrey Barbeau arrived at the scene. They had with them a search warrant for the Montgomery property and arrest warrants for the defendants. Doud advised the defendants that they were under arrest for violation of federal narcotic laws. As Agent Barbeau read the defendants their *Miranda* rights, Agent Doud walked away to talk to the other state and local officers. Agent Doud returned to where the defendants were sitting on the tailgate and asked Taft if he would be willing to walk to the side of the cabin with him and Agent Barbeau to talk, without defendant Whitaker. Agents Doud and Barbeau walked with Taft to the side of the cabin, approximately thirty feet away from where Whitaker was sitting.

At this point, the testimony of Doud and Taft begins to differ drastically. The following is Doud's account, which this court finds to be accurate. Doud asked Taft if he had been advised of his rights. Taft responded affirmatively. Nevertheless, Agent Doud readvised Taft of his Miranda rights, "just as a precautionary measure." T1-10. According to Doud, he then asked Taft if, "keeping those rights in mind, he would be willing to cooperate with DEA and answer some questions." T1-12. Taft said he would. Doud understood this to be a waiver of Taft's *Miranda* rights. Doud then advised Taft that he was looking at a minimum mandatory sentence of five years

1. A number of marijuana plants were found growing in a field adjacent to the Montgomery property and various growing and cultivation equipment was found during execution of the search warrant.

for "what was going on at [the] location." T1–12. Taft replied that "he didn't understand why he had any problem because the marijuana wasn't growing on his property." *Id.* Doud asked "who had said anything yet about a marijuana field." *Id.* Doud inquired as to whether or not Taft was willing to cooperate with DEA. Specifically, Doud wanted to know if Taft had marijuana growing anywhere else inside or outside Vermont and if Taft had any drugs in his residence at Stowe. Taft responded negatively to both questions. Doud asked if DEA could go down to Stowe to "look at the house." Taft replied that they "could look all that [they] wanted because he had no drugs there at all." T1–14. Then Taft said he wanted to speak with Whitaker before he was willing to cooperate or answer more questions. Agents Doud and Barbeau brought Taft back to the tailgate of the pick-up truck.

Thereafter Agents Doud, Barbeau and Merriam took Whitaker around to the side of the building to repeat the same process. Agent Doud readvised Whitaker of his Miranda rights. Barbeau informed Whitaker that he was facing five years for the illegal growing of marijuana and five for possession of firearms, and Doud said that they had a video of the two defendants in the marijuana field. T2–13. Doud asked Whitaker if he was willing to cooperate, and asked whether there were any other marijuana fields. Whitaker responded that it was against his principles to talk and he did not think marijuana was any worse than alcohol or cigarettes, and therefore should not be criminalized. Whitaker also said that he would work for DEA if they "gave [him] a gun and a badge and a salary." T2–13. The discussion ended when Whitaker said he wanted to speak to Taft, at which point, the agents took him back to where Taft was sitting.

Thereafter, Taft and Whitaker, in a conversation by themselves, decided that they did not want to talk further with the DEA without first talking to a lawyer. However, this decision was not then communicated to the agents. T1–157, T2–16. At that point, Ziggy and his partner led the defendants back to their car out at the road. Doud had instructed Ziggy to "let them sit and think about cooperation for awhile." T2–134. Approximately forty minutes later, Ziggy and his partner drove the defendants to the DEA office in Williston.

During the wait, Taft asked how much time he and Whitaker could get for the case. Ziggy responded that he was not allowed to act as an attorney, but that he believed it would be around five years. T2–135. Taft then said they did not deserve to go to jail because there were worse crimes in the world for which people deserve to be sent to jail. During the drive back to Williston, Ziggy tried to get the defendants to cooperate. In response to a question from Ziggy regarding informing on other drug dealers, Taft stated that he knew only a few small marijuana dealers in the area and Whitaker said he knew a cocaine source in Florida. The rest of the conversation was as follows:

A I asked him who they were. I asked them to start cooperating now, as soon as possible, that it would be better, for their benefit to tell me at this point.

Q Did either of the defendants respond?

A No, they stopped at this point. They didn't answer, so then there was a—like a moment of silence or short period of time of silence, and I told them, "Well, if you want, you may want to speak with an attorney to discuss this matter first," and they—Mr. Whitaker said, "Yeah, let's do that."

. . . .

Mr. Whitaker then asked me, "Well, when we get down to the office, can we call—use your phone to call an attorney?" And I said yes.

T2–138. Ziggy indicated that he understood that both Whitaker and Taft wanted to talk to a lawyer following this conversation. T2–195–96.

Both defendants testified and the court finds that each of them told Ziggy during the ride to Williston that they wanted to speak with a lawyer.

Although the testimony suggests at least three different versions of the events that followed, after arrival at the DEA offices in Williston, Vermont, the Court finds the following to be an accurate recitation of the events.

Upon arrival, Ziggy took the defendants to an interrogation room, handcuffs were removed and the defendants, along with Ziggy and his partner, ate sandwiches that they had purchased on the way to Williston. Thereafter, the defendants gave a personal history and mug shots and fingerprints were taken.

Ziggy made some additional attempts to convince the defendants to cooperate and told them that the Government had a video tape showing the defendants in the marijuana field. At that point, Whitaker said "I guess I should have done a perimeter search of the property."

Shortly thereafter, Whitaker reminded Ziggy that they had requested to make a call to their attorney. A phone was obtained and Taft attempted to call his attorney in Hyde Park, but, at that point, it was after five o'clock in the afternoon and Taft could not reach anybody at his attorney's office. After the unsuccessful attempt to reach an attorney, Agent Doud arrived back at the DEA offices. Ziggy, at that point, left the defendants with Doud without telling him that they had requested the services of counsel. Doud then asked the defendants on his own whether they had made any requests for an attorney and both defendants indicated that they had tried to reach counsel, but had been unsuccessful. Doud then asked them whether, even though they had attempted to call counsel, they would be willing to permit him to continue their interview. Defendants indicated that they would and Doud then proceeded to interview the defendants, asking them a number of questions and obtaining numerous statements from each of them.

Thereafter, Agent Doud produced a consent form to search the defendant Taft's house in Stowe, Vermont. Taft said he was not going to sign anything until he spoke to a lawyer, at which point Agent Doud indicated he could get a search warrant anyway and that if he had to get a search warrant the defendants wouldn't recognize their place since it would be torn apart during the search. Agent Barbeau indicated that a refusal to cooperate, by at least signing the consent form, would probably result in neither defendant being released on bail. Thereafter, defendant Taft signed a consent form.

## DISCUSSION

### I. SUPPRESSION MOTIONS

#### A. *Admissibility of Post–Arrest Statements*

The legal principles controlling post-arrest questioning are well-settled. A suspect must be informed of their rights to remain silent and to the presence of an attorney. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). These rights may be waived; the waiver must be knowing, intelligent and voluntary. *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883–84, 68 L.Ed.2d 378 (1981). If a suspect requests counsel, all interrogation must cease until an attorney is present. *Id.* at 484–85, 101 S.Ct. at 1884–85. The police may not resume questioning without making an attorney available to the defendant unless the defendant initiates further discussions with the police and knowingly and intelligently waives his right to counsel. *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 492–93, 83 L.Ed.2d 488 (1984). Furthermore, the Second Circuit has held that if an accused asserted request for counsel is ambiguous or equivocal, questions limited to clarifying the request are permitted. *United States v. Gotay*, 844 F.2d 971, 975 (2d Cir.1988).

The government in the instant case argues that *Gotay* controls here. The government's position is that the first request for counsel was during the drive to Williston when Whitaker responded to Ziggy's suggestion that they may wish to speak to an attorney to discuss whether or not they should cooperate. T2–138. According to Ziggy, Whitaker replied: "Yeah, let's do that. Well, when we get down to

the office, can we call—use your phone to call an attorney?" *Id.* The government argues that this was not a specific statement that the defendants wanted to speak to an attorney before questioning continued. The government also claims that Taft's attempt to call his attorney from the DEA office was "not a broad statement that all further communications should be through counsel." Post–Hearing Memorandum at 27. Hence, the government concludes that Doud's questions when he arrived at the DEA office were appropriate clarifying questions under *Gotay*, and that the defendants at that point waived their right to counsel.

The defendant makes two alternative arguments. First, that all post-arrest statements in Montgomery and in Williston should be suppressed because both defendants requested an attorney in Montgomery when Barbeau initially advised them of their *Miranda* rights. Second, if this court were to believe the government's testimony that the defendants asked to phone a lawyer during the drive to Williston, all the post-arrest statements subsequent to the defendants' request must be suppressed because the request was unambiguous.

■ This court finds that neither Whitaker nor Taft requested counsel in Montgomery, but that the defendants requested to phone a lawyer during the drive to Williston. We also agree with the defendants that Whitaker's request to phone a lawyer during the drive to Williston was an unequivocal request for counsel. In analyzing a defendant's request for counsel, we take a defendant's words "understood as ordinary people would understand them." *Connecticut v. Barrett,* 479 U.S. 523, 529, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987). Whitaker's statement, "Yeah, let's do that. Well, when we get down to the office, can we call—use your phone to call an attorney?" can only be understood as expressing a desire to obtain counsel before continuing with any interrogation. The request to call a lawyer came immediately after defendants were silent in response to Ziggy's inquiry for the names of other drug dealers and Ziggy suggested they

speak to a lawyer before they cooperated with the DEA.

Moreover, we find that the request to call a lawyer was from both Taft and Whitaker. Whitaker said "can *we* call ... an attorney," and Taft was the one who actually phoned the attorney from the DEA office. Agent Wutkiewicz testified that he understood both Whitaker and Taft wanted to speak with an attorney after the conversation during the drive to Williston. T2–195–96.

■ The defendants were not required to state their request for counsel with any more specificity. The government claims that the request for counsel was only connected to discussing whether or not they should identify the drug dealers as opposed to speaking to an attorney before questioning continued. A defendant need not articulate exactly why or for what purposes he is seeking counsel. *Michigan v. Jackson,* 475 U.S. 625, 633 n. 7, 106 S.Ct. 1404, 1409 n. 7, 89 L.Ed.2d 631 (1986). Also, "[d]oubts must be resolved in favor of protecting the constitutional claim.... [We must] give a broad, rather than a narrow, interpretation to a defendant's request for counsel." *Id.* at 633, 106 S.Ct. at 1409. All requests for counsel are to be given broad effect even when less than all-inclusive. *Connecticut v. Barrett,* 479 U.S. at 529, 107 S.Ct. at 832. "[A]n accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith v. Illinois,* 469 U.S. 91, 100, 105 S.Ct. 490, 495, 83 L.Ed.2d 488 (1984). Taft and Whitaker's post-request statements are relevant only to the question whether the accused waived the right he had invoked. *Edwards* instructs that invocation and waiver must be kept as two distinct inquiries because *all* questioning must cease after an accused requests counsel. A valid waiver "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation." *Edwards,* 451 U.S. at 484, 101 S.Ct. at 1884.

Furthermore, that Taft and Whitaker's request for counsel was clear and unequivocal is supported by a number of cases in

which courts have held similar or less direct requests to be unequivocal. In *Smith v. Illinois*, 469 U.S. at 93, 96–97, 105 S.Ct. at 491–92, 493–94, the Supreme Court held that a suspect had made an unequivocal request for attorney when, upon learning that he had the right to the presence of counsel, he stated, "Uh, yeah, I'd like to do that." It was irrelevant that later, after the police asked the defendant if he would like to talk without a lawyer being present, the defendant said, "Yeah and no, uh, I don't know what's what, really." This subsequent statement had no bearing on the clarity of the initial invocation of counsel itself—it was made after all questioning should have ceased and in response to impermissible police-initiated interrogation. In *United States v. Gotay*, 844 F.2d 971 (2d Cir.1988), the Second Circuit held that an accused's statement that she could not afford a lawyer and was concerned about obtaining a lawyer was a clear request for counsel. *See also Robinson v. Borg*, 918 F.2d 1387, 1391–93 (9th Cir.1990) (defendant's statement, after being advised of his rights and answering some questions, "I need a good lawyer, man. Can I make a phone call?" held to be unambiguous request for counsel requiring all interrogation to cease).

Furthermore, cases where a defendant's request for counsel has been held to be equivocal stand in stark contrast to the instant case. In *United States v. Fouche*, 776 F.2d 1398, 1405 (9th Cir.1985), the defendant's statement that he "might want to talk to a lawyer" and wanted to make a

phone call was an equivocal request for counsel. Likewise, defendant's request for counsel was equivocal when he stated "maybe I should talk to an attorney before making a further statement," followed by, "why should I not get an attorney?" *United States v. Cherry*, 733 F.2d 1124, 1130 (5th Cir.1984). According to the government's own testimony, neither Taft nor Whitaker used the words "maybe" or "might" in their request for counsel.

 Taft and Whitaker's request for counsel during the drive to DEA headquarters in Williston was unequivocal. This court orders that the statements either defendant made after that request are suppressed.[2]

**B. Suppression of Evidence Seized from the Defendants' Stowe Residence**

Taft contends that the evidence seized from the Stowe residence must be suppressed for two reasons. First, Taft's consent to search was obtained after the police initiated discussion after the defendants had invoked their right to counsel. Hence, the consent was obtained in violation of his Fifth Amendment right to counsel. Second, Taft argues that the consent was not voluntarily given and therefore the evidence was seized in violation of his Fourth Amendment rights.

 The government contends that Fourth Amendment considerations of voluntariness are controlling on this issue and that consent was given voluntarily.[3]

---

**2.** Taft also argues that the defendants' statements should be suppressed because he was not presented to a judicial officer "without unnecessary delay" as required by Fed.R.Crim.P. 5(a). Under 18 U.S.C. § 3501(c), a confession is not to be excluded "solely because of delay" in bringing an arrested person before a magistrate if the confession "was made or given by such person within six hours immediately following his arrest or other detention." The court has discretion to suppress a statement made after a delay of greater than six hours, if it finds that the delay was unreasonable. *United States v. Perez*, 733 F.2d 1026, 1035 (2d Cir.1984). The defendants were arrested between 11 o'clock and noon and Doud's last round of questioning was sometime between five and six o'clock. The defendants were presented to a federal judge the

following day. Considering that the transport from Montgomery to Williston took approximately an hour and that the DEA agents needed sufficient time to execute the search warrant at Montgomery. We find the delay in the instant case to be reasonable.

**3.** The government in its post-hearing memorandum, relies on both the written consent to search form and "oral consent" given by Taft in Montgomery. Government's Post–Hearing Memorandum at 27. Doud's testimony was: "I asked if we could go down to Stowe to look at his house, to see if he was telling us the truth, and he said we could look all that we wanted to because he had no drugs there at all." T1–14. In view of the subsequent events at the DEA office in Williston wherein the agents improper-

■ Whether it is constitutionally impermissible to seek the consent of a suspect in police custody to a warrantless search of his premises after he has requested an attorney in the course of interrogation and before he has been permitted to consult with counsel is a question not yet addressed by the Second Circuit Court of Appeals. We hold that consent in this case was obtained in violation of defendants' Fourth and Fifth Amendment rights.

It is true that *Miranda* and *Edwards* are concerned with the admissibility of a suspect's statements, rather than the validity of a consent to search. It is also true that a consent to search is not a statement of the defendant. It therefore poses "no possible violation of the Fifth Amendment rights since the consent to search is not 'evidence of a testimonial or communicated nature.'" *United States v. Faruolo,* 506 F.2d 490, 495 (2d Cir.1974) (quoting *Schmerber v. California,* 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966)).

■ Nevertheless, it is well settled that when a person requests counsel during custodial interrogation, all questioning must cease until counsel has been made available, unless the person in custody initiates further communication with the police. *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85. The Supreme Court created this "bright-line rule" to

> serve the purpose of providing "clear and unequivocal" guidelines to the law enforcement profession. Surely there is nothing ambiguous about the requirement that after a person in custody has expressed his desire to deal with the police only through counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

*Arizona v. Roberson,* 486 U.S. 675, 682, 108 S.Ct. 2093, 2098, 100 L.Ed.2d 704 (1988) (quoting *Edwards,* 451 U.S. at 484–85, 101

S.Ct. at 1884–85). The DEA agents violated this bright-line rule when they asked defendants for consent to search after defendants had requested and had unsuccessfully attempted to reach their attorney. *Edwards* requires that the police make counsel *available* to a defendant who so requests; simply giving a defendant the opportunity to contact counsel does not satisfy *Edwards.* All of the evidence obtained from the consent search was gained through the exploitation of a Fifth Amendment violation and therefore should be suppressed. *United States v. Yan,* 704 F.Supp. 1207, 1211–12 (S.D.N.Y.1988) (rationale of *Edwards* broad enough to include "interrogation" about whether the accused will consent to a warrantless search); *see also United States v. Rojas,* 655 F.Supp. 1156, 1168 (E.D.N.Y.1987) (evidence found as a result of oral consent to search suppressed because consent was product of questioning in violation of defendant's exercising his rights under *Miranda* to remain silent); *United States v. D'Antoni,* 856 F.2d 975 (7th Cir.1988) (obtaining defendant's consent to search after he invoked right to counsel arguably violated *Edwards* bright-line rule); *People v. Johnson,* 48 N.Y.2d 565, 423 N.Y.S.2d 905, 399 N.E.2d 936 (1979) (consent to search held legally ineffective, even though found to be voluntarily given, because it was unconstitutionally obtained after request for attorney was not granted).

■ We also find that Taft's consent to search was not voluntary under the Fourth Amendment. For a warrantless search, the government has the burden of proving consent voluntarily given by a preponderance of the evidence. *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968). "[T]he question whether a consent to search was, in fact, 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined form the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48,

ly obtained a written waiver, this Court holds that any oral consent which might have been

obtained in Montgomery was revoked by defendants.

36 L.Ed.2d 854 (1973); *United States v. Moreno*, 897 F.2d 26, 33 (2d Cir.1990). This court agrees with Defendant that consent was the product of coercion.

We find that the agents disregard of the defendants' request for counsel, their threats that they would tear the apartment apart and their suggestion that the defendants would not be released on bail unless they signed the consent to search form amounted to coercion that rendered Taft's consent involuntary. The rationale of *Edwards* supports the conclusion that failure to honor defendants' request for counsel in and of itself creates a coercive situation. *Miranda* warnings are prophylactic protections to combat the "inherently compelling pressures" of custodial interrogation and "to permit a full opportunity to exercise the privilege against self-incrimination." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624. *Edwards* prohibits police initiated questioning after a suspect requests counsel until such counsel is provided because:

> if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" and not the purely voluntary choice of the suspect.

*Arizona v. Roberson*, 486 U.S. at 681, 108 S.Ct. at 2097–98. *Roberson* held that *Edwards* applies to bar police-initiated interrogation following a suspect's request for counsel in the context of a separate investigation. In other words, the suspect's waiver of his rights during the second investigation was ineffective because it was obtained through a *Miranda* violation. Hence, under *Edwards*, a request for counsel creates a presumption that any subsequent waiver of the right to counsel at the authorities' own initiation was coercive and not purely voluntary. Likewise, any consent to search would be presumptively coercive. Added to this, is the pressure Taft

felt by Doud's statement that the house would be torn up if a search warrant had to be obtained. *See United States v. Kampbell*, 574 F.2d 962 (8th Cir.1987) (consent coerced when defendant was told, after refusing to consent, that a search warrant would give the police "the authority to tear the paneling off the walls"). Also, both defendants were told by either Barbeau or Doud that failure to cooperate by signing the consent form would probably prohibit them from being released on bail.

Defendant's motion to suppress the evidence seized from the Stowe residence is GRANTED on both Fourth and Fifth Amendment grounds.

## II. TAFT'S MOTION FOR RETURN OF FIREARMS SEIZED IN MONTGOMERY AND DOCUMENTS SEIZED FROM STOWE RESIDENCE

■■■ Taft moves pursuant to Federal Rule of Criminal Procedure 41(e) for the return of two firearms seized in Montgomery and certain documents and personal correspondence seized during the search of the Stowe residence.[4] Under Rule 41(e), defendant must show that he is either "aggrieved by an unlawful search and seizure or by the deprivation of property." Fed. R.Crim.P. 41(e). Since this motion was made after the indictment was filed, "it shall be treated also as a motion to suppress under Rule 12." *Id.*

■■■ To begin with, we find that the seizure of the two firearms in Montgomery was lawful. The truck was legally seized pursuant to 21 U.S.C. § 881(a)(4). During an inventory search of the contents of the vehicle, the guns could be seized. *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Alternatively, the police had authority to seize the guns when they placed Taft and Whitaker under custodial arrest because the guns were in the passenger compartment of the truck. *New York v. Belton*, 453

---

**4.** Originally, this 41(e) motion included a request for the nine firearms seized from the Stowe residence. During the hearing, the government stipulated that it will return the

nine weapons, with the understanding that the weapons be given to a designee because it is illegal for the defendants to receive firearms while under indictment. T1–73–74.

U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

■ Since the search and seizure was lawful, to prevail on his 41(e) motion for the return of the firearms, Taft must demonstrate that he is a "person aggrieved ... by the deprivation of property." To do so he must show that the retention of the property by the government is unreasonable. *In re Search of Kitty's East (Kitty's East v. United States)*, 905 F.2d 1367, 1375–76 (10th Cir.1990). The Advisory Committee Note to the 1989 Amendment to Rule 41(e) states that

> ... reasonableness under all of the circumstances must be the test when a person seeks to obtain the return of property. If the United States has a need for the property in an investigation, its retention of the property generally is reasonable.

Fed.R.Crim.P. 41(e), Advisory Committee Note, 1989 Amendment. Taft argues that the firearms have no evidentiary purpose. Supplemental Memorandum at 30. Having decided that the government legally seized the two firearms, this court will not opine as to the evidentiary value of the guns in the instant prosecution for cultivation of marijuana. We hold that the government's retention of the two firearms is reasonable while the prosecution is still pending.

■ Since the search of the Stowe residence was unlawful, the personal correspondence and documents seized must be returned and it is so ORDERED.

## III. MOTION FOR FRANKS HEARING

### A. *Material Misstatements and Omissions*

■ Defendant moves for a *Franks* hearing to attack the truthfulness of the search warrant affidavit used to obtain the search warrant for the Taft property in Montgomery. In order to establish probable cause to search a residence it must be shown that a "crime was committed, and that there is probable cause to believe that evidence of such crime is located at the residence." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir.1983). The facts contained in the warrant affidavit in the instant case established probable cause to believe that the defendants were growing marijuana on property adjacent to their own and that instrumentalities used to facilitate the illegal cultivation would be found at the residence. Defendant challenges several allegations in the warrant affidavit. The Supreme Court in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), said:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Id.* at 155–56, 98 S.Ct. at 2676. Defendant's initial burden is great because there is a presumption of validity with respect to the affidavit supporting the search warrant. *Id.* at 171, 98 S.Ct. at 2684. The defendant must make "a substantial preliminary showing that 1) the warrant affidavit includes a false statement, 2) the statement was made knowingly and intentionally or with reckless disregard for the truth, and 3) the allegedly false statement is necessary to a finding of probable cause...." *United States v. United States Currency, the Amount of $228,536*, 895 F.2d 908, 919 (2d Cir.1990) (citing *Franks*, 438 U.S. at 155–56, 98 S.Ct. at 2676–77). Therefore, no hearing is required if, "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause...." *Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684.

Defendant specifically points to several portions of the affidavit that he claims are false and made with reckless disregard for the truth. First, Taft attacks the information provided by a confidential informant for omitting background information regarding the informant. Affidavit ¶ 4. Second, defendant challenges the assertion

that "review of the videotape of the marijuana plot shows both Steven Whitaker and James Whitaker Taft in the marijuana field." Affidavit ¶ 14. Third, Taft attacks the affiant's assertion that, "based on my training and experience, I believe Taft and Whitaker would not place the marijuana plants on their own property in an attempt to shield their property from forfeiture...." Affidavit ¶ 8.

■ Defendant first challenges the allegations in the affidavit concerning the defendant's involvement in the marijuana growing scheme, which are based on the assertions of a confidential informant. Defendant argues that the affidavit omits the material facts that the informant was the subject of pending or potential criminal charges and was receiving compensation for his information, both of which substantially undermines the reliability of the information. Defendant cites this court for the proposition that "in some instances, the informant's criminal background may bear on the assessment of reliability and may materially affect probable cause." *United States v. Wells*, Crim. No. 88–87, slip op. at 9, 1989 WL 252841 (D.Vt. January 30, 1989) (Billings, C.J.). Also, defendant claims that the government, by intentionally omitting the CI's motives for providing information, robbed the judicial officer of an opportunity to assess the probativeness of the evidence contained in paragraph 4 of the affidavit. Defendant's Memorandum in support of Motion for Franks Hearing at 4.

■ Although the Supreme Court, in *Franks*, did not discuss material omissions, this court has agreed with other lower courts that "[m]aterial omissions may ... be grounds for a *Franks* hearing...." *Wells*, slip op. at 9; *United States v. Stanert*, 762 F.2d 775 (9th Cir.1985); *United States v. Rule*, 594 F.Supp. 1223 (D.Me. 1984); *United States v. Melvin*, 596 F.2d 492 (1st Cir.1979); *United States v. Dennis*, 625 F.2d 782 (8th Cir.1980). In order to establish the right to a *Franks* hearing, however, the defendant must show that, "by virtue of the omission, the affidavit was intentionally or recklessly misleading, and that this misrepresentation materially

affected the finding of probable cause." *Wells* slip op. at 10. Hence, the affiant cannot intentionally or recklessly prepare a search warrant affidavit to create a materially false impression of enhanced reliability. *Id.; see also United States v. Rule*, 594 F.Supp. at 1240–1241.

In *Wells*, Judge Billings focused on the issue of materiality. While he found that omission of an informant's criminal background may be relevant for assessing reliability and therefore materially affect probable cause, he found that the affiant's independent investigation had "provided the Magistrate with substantial information to corroborate the informant's story." *Id.* at 11 (citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (reliability of anonymous tip sufficiently established by independent corroboration, in light of the totality of the circumstances)). Hence, Judge Billings found that "even assuming the facts alleged by defendants to be true, we conclude that the alleged omission of information regarding the informant did not materially affect the Magistrate's finding of probable cause." *Id.*

As was the case in *Wells*, the information in paragraph four of the affidavit was independently corroborated by the police in their three month investigation. The independent corroboration in the instant case was sufficient to permit Judge Coffrin to determine that the informant was reliable. In April, 1990, the CI told the Vermont Drug Task Force: (1) that Steven Whitaker and James Whitaker Taft were growing marijuana at their residence in Stowe, Vermont; (2) that Steven Whitaker had shown him three portable green houses made of plexiglass and designed to automatically open when the internal temperature reached a certain level; (3) that Whitaker said that the greenhouses were being used by him and Taft to start the growth of marijuana seedlings; (4) that he was told that the plants were going to be relocated to a field "up north" that was close to property owned by the defendants; and (5) that at one time he was told by Whitaker that Taft owned property in the Montgomery area. Affidavit ¶ 4.

One month later, a concerned citizen told the Vermont State Police that he/she had seen a marijuana plot on property on Fisher Road in Montgomery, Vermont. Affidavit ¶ 5. When taken to this plot by the citizen, the Vermont State Police observed two portable greenhouses, made of plexiglass and designed to open and close automatically according to the internal temperature. Each portable greenhouse contained about 150 marijuana seedlings planted in styrofoam cups and sat on a sheet of plywood. Investigation revealed that the portable greenhouses were located adjacent to property owned by James Whitaker Taft, and approximately 200 yards away from the Taft cabin. Affidavit ¶ 6. A second concerned citizen informed the Vermont State Police that Steven Whitaker and James Taft came to the Montgomery property once every two weeks, usually stayed for a short period of time and always shot guns off. Affidavit ¶ 7.

A Vermont Drug Task Force member inspected the property in late May, 1990. Affidavit ¶ 9. He found that the portable greenhouses were no longer at the plot, most of the plants had been transplanted into the ground, and planting tools were about 25 feet away from the plot. *Id.* On June 19, 1990, the affiant, with other members of the Task Force, visited the site and found about 200 plants in the ground. The plants had been recently cultivated, commercial fertilizer was present in the soil, and fertilizer, plant food and cultivation tools were near the stream. Affidavit ¶ 10. Ten marijuana plants still in styrofoam cups sat near the stream. A foot path led from the plot to Taft's cabin, along which the affiant observed spilled fertilizer for a 50 yard stretch. With binoculars, from about 50 yards away, the affiant observed two plywood sheets similar in size to the ones used under the portable greenhouses and a number of styrofoam cups. *Id.* Weekly visits to the site by members of the Task Force revealed additional fertilizer, moved watering cans, and bug spray. On August 18, 1990, a motion detector installed at the site was activated while Detective Barbeau was at the site. Affidavit ¶ 13. From 100 yards of the site, Barbeau heard two male voices. A short while later, Barbeau heard gun shots from the Taft cabin and twenty minutes later he observed Taft and Whitaker drive away from the cabin in a red pickup truck. *Id.* Subsequent inspection of the marijuana plot on August 21, 1990 showed that about two dozen of the marijuana plants were removed. Several marijuana leaves were found on the foot path and trampled vegetation along the foot path evidenced recent travel. Affidavit ¶ 8. All of the detailed observations outlined in the affidavit corroborate what the Vermont State Police learned from the CI. The corroboration establishes the CI's reliability for purposes of determining probable cause. Thus, even assuming that defendant's allegations that the informant was the subject of pending or potential charges and was receiving compensation for his tips were true, omission of this information did not materially affect the finding of probable cause.

▇▇▇ Defendant's second challenge to the affidavit is to the statement: "review of the video tape shows both Steven Whitaker and James Whitaker Taft in the marijuana field." Affidavit ¶ 14. Defendant alleges that review of the videotape shows "blurry images that resemble supernatural beings more than they look like Taft or Whitaker." Defendant's Memorandum in Support of *Franks* Motion at 3. Therefore, defendant contends that the statement that Taft and Whitaker can be identified in the videotape was made with reckless disregard for the truth.

Assuming that the figures in the videotape are unidentifiable, and therefore the statement about the videotape in the affidavit was made with reckless disregard for the truth, *Franks* requires us to strike that portion of the affidavit and then to test the sufficiency of the remainder. We find that the affidavit, with all information about the videotape eliminated, still provides sufficient evidence for a finding of probable cause. Therefore, defendant's second challenge to the warrant affidavit fails.

▇▇▇ Defendant's third attack on the affidavit is the affiant's assertion that

"[b]ased on my training and experience, I believe Taft and Whitaker would not place the marijuana plants on their own property in an attempt to shield their property from forfeiture should the marijuana plants be discovered." · Affidavit ¶ 8. Defendant argues that Detective Doud had no access to the defendants' mental process and thus, the statement was speculative. This argument goes to the weight to be given the statement, rather than its recklessness. In any event, the absence of this statement would not effect the probable cause finding.

### B. *Fourth Amendment Challenge to Initial Police Investigation*

■ In connection with the challenges to portions of the affidavit above, defendant argues that paragraphs 6, 10 and 11 of the warrant affidavit detail observations government agents made of the defendant's house after they impermissibly intruded onto the defendant's property in violation of his Fourth Amendment rights. Defendant claims that the observations made of the defendants' house detailed in the warrant affidavit were made after Detectives impermissibly intruded onto defendants' property.

■ The Fourth Amendment provides a person with a constitutionally protected reasonable expectation of privacy in his/her home and the surrounding curtilage, but not in the "open fields" of their property. *United States v. Dunn,* 480 U.S. 294, 300–301, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987); *United States v. Wells,* slip op. at 8. The Fourth Amendment protects people in their "persons, houses, papers, and effects," but "open fields" are not "effects" within the meaning of the Fourth Amendment. *Oliver v. United States,* 466 U.S. 170, 176, 104 S.Ct. 1735, 1740, 80 L.Ed.2d 214 (1984). "Open fields" include "any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech." *Id.* at 180 n. 11, 104 S.Ct. at 1742 n. 11. The four factors to consider when defining the extent of a home's curtilage are: "the prox-

imity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Dunn,* 480 U.S. at 301, 107 S.Ct. at 1139; *see also California v. Ciraolo,* 476 U.S. 207, 221, 106 S.Ct. at 1817, 90 L.Ed.2d 210 (1986). The *Dunn* court held that a barn located 60 yards away from a house was not within the curtilage of the house. The barn was outside the area surrounding the house enclosed by a fence, the barn was not used for intimate activities of the home and the defendant did little to protect the barn from observation by those in the nearby open fields. *See also Oliver v. United States,* 466 U.S. 170, 177, 104 S.Ct. 1735, 1740–41, 80 L.Ed.2d 214 (1984) (no Fourth Amendment violation when police, bypassing a locked gate and a "No Trespassing" sign, follow footpath and road through defendant's property to discover marijuana field). In the instant case, observations of the cabin at issue were made "[f]rom approximately 50 yards, with the aid of binoculars" as the affiant was walking along the footpath that lead from the marijuana plot to the cabin. Affidavit ¶ 10. The police officers were not within the curtilage of defendant's property; observations in the affidavit were made while detectives were in the "open fields" surrounding defendant's property.

Furthermore, we can find no constitutional violation simply because defendant's home and objects within the curtilage were observed. As stated in *Dunn,* "there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields.... [T]he fact that the objects observed by the officers lay within an area that we have assumed ... was protected by the Fourth Amendment does not affect our conclusion." 480 U.S. at 304, 107 S.Ct. at 1141.

In sum, the defendant has failed to make the requisite "substantial preliminary showing" to establish his right to a *Franks* hearing on the basis of either material misstatements or material omissions in the

warrant affidavit. No Fourth Amendment violation occurred in the police investigation leading up to the issuance of the search warrant. Defendant's *Franks* hearing request is DENIED.

## IV. MOTION TO BAR THE INTRODUCTION OF EVIDENCE RELATING TO PLANTS INTENTIONALLY DESTROYED BY THE GOVERNMENT AND TO PRECLUDE PUNISHMENT UNDER 21 U.S.C. § 841(b)(1)(B)

■ Defendant Taft moves and defendant Whitaker joins in the motion to bar introduction of evidence relating to the 260 marijuana plants destroyed by the government on August 30, 1990. The defendants are charged with violations of 21 U.S.C. §§ 841(a)(1), 846. The mandatory minimum penalty provision of at least five years prison sentence under 21 U.S.C. § 841(b)(1)(B) is triggered by the existence of over 100 plants.

The Second Circuit has held that the number of plants at issue under § 841(b)(1) is not an element of the §§ 841(a) and 846 offenses with which defendants are charged.[5] Section 841(b) only sets forth enhanced penalty provisions based on the quantity of controlled substances involved. The quantity is only relevant for enhancement of the sentence. *United States v. Campuzano,* 905 F.2d 677, 679 (2d Cir. 1990). For purposes of trial, therefore, the government need only prove that "a quantity" of marijuana was involved. There are ten samples retained for analysis available to Taft for inspection, which of course are relevant for determining if in fact any of the plants seized were marijuana.

■ Even if the number of plants were relevant for purposes of proving the essential elements of 21 U.S.C. § 841(a), defendants have failed to establish that their constitutional rights have been violated by the government's failure to preserve the plants. To show a constitutional violation from missing evidence, the defendant must

show that the evidence was "material" to his defense. *California v. Trombetta,* 467 U.S. 479, 488, 104 S.Ct. 2528, 2533–34, 81 L.Ed.2d 413 (1984); *United States v. Rastelli,* 870 F.2d 822, 833 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989). To be "material", "evidence must possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S.Ct. at 2534. The defendant must also show that the government acted in bad faith. *Id.* at 488, 104 S.Ct. at 2533–34; *Rastelli,* 870 F.2d at 833; *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.")

■ Defendants fail to meet their burden under the first prong of the *Trombetta* test or show bad faith. Defendants state that the government "intentionally destroyed the only reliable evidence from which" to determine the number of plants involved in order to show "bad faith." The plants are not the only evidence of the number—there are photographs of the field, a videotape and the agents' testimony. Defense counsel did not request that the government preserve the plants until the day of the indictment, September 20, 1990, when the plants were seized on August 23, 1990. The government had already destroyed the plants by the time counsel made his preservation request. Given the infeasibility of retaining such a large number of plants for any length of time, as well as the fact that samples were taken for testing to prove that the plants were marijuana, we will not attribute any bad faith to the government in destroying the plants. Moreover, the trigger for § 841(b)(1)(B) penalties is 100 plants. Here there are allegedly some 260 plants. It is

---

**5.** Section 841(a) makes it unlawful to distribute a controlled substance, while § 846 proscribes conspiracies to violate § 841(a). Section 841(b)(1) provides mandatory minimum penalties for violations of § 841(a).

unlikely that the government miscounted by over 160 plants. Therefore, it is doubtful given other existing evidence that preservation of the plants would have been exculpatory.[6] Defendants' Motion To Bar is DENIED.

## V. MOTION TO SEVER DEFENDANTS' TRIALS

 Defendant submits that his trial should be severed from that of Whitaker, his codefendant, because the government may seek to introduce statements by Whitaker that would incriminate him and potentially violate his constitutional rights if Whitaker fails to testify. Defendant does not argue that there has been a misjoinder under Federal Rule of Criminal Procedure 8(b), but only that joinder is so prejudicial that it justifies severance pursuant to Federal Rule of Criminal Procedure 14. That rule provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

The matter is left to the discretion of the trial court. *United States v. Rucker*, 586 F.2d 899, 902 (2d Cir.1978). The trial court, in exercising its discretion, must balance the inconvenience and expense to the government of separate trials against the prejudice to the defendants in a joint trial. 1 C. Wright, Federal Practice and Procedure § 223, at 787 (2d ed. 1982); *United States v. Werner*, 620 F.2d 922, 928–29 (2d

Cir.1980). "The burden is upon a moving defendant to show facts demonstrating that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial." *Rucker*, 586 F.2d at 902. *See also United States v. Lyles*, 593 F.2d 182, 189–90 (2d Cir.1979), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *United States v. Stirling*, 571 F.2d 708, 733 (2d Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978).

 Not only does defendant have a heavy burden, but this motion is premature. Defendant is correct that a *Bruton* problem can arise. In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Court ruled that admission of a non-testifying co-defendant's statements that incriminate the defendant violated defendant's Sixth Amendment right to confrontation. Here, however, we do not know "whether such statements will in fact be introduced and if so whether co-defendant [Whitaker] will testify." *United States v. Copen*, 378 F.Supp. 99, 101–02 (S.D.N.Y.1974).

Accordingly, we DENY the motion as premature with leave to renew when the likelihood of prejudice has actually been shown. *See Lyles*, 593 F.2d at 192.

## VI. MOTION TO COMPEL GOVT TO DISCLOSE BRADY EVIDENCE

Defendant has made a *Brady* demand for disclosure of any promises of leniency or immunity from prosecution made by the government to the confidential informant.[7]

 *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) held that

> the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

---

6. Given the holding in *Campuzano* that the number of plants is not an element of § 841(a), the number of plants could never be exculpatory for purposes of guilt.

7. Defendant concedes that its *Brady* demand for the identity of the informant is privileged information under *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

*Id.* at 87, 83 S.Ct. at 1196–97. Impeachment evidence falls within the *Brady* rule. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Impeachment material includes promises of leniency or immunity for government witnesses. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

 The evidence defendant seeks, however, is only discoverable if the informant were to testify. Since the government has said that the informant will not be a witness, any promises of leniency could not be exculpatory at trial. This information only goes to the reliability of the informant, and therefore is only useful for challenging the sufficiency of the warrant affidavit for the search. Defendant has made this challenge in his *Franks* motion, which this Court has addressed. Defendant's motion is DENIED.

## CONCLUSION

Both defendants' motions to suppress statements made after the request for counsel during the trip to Williston are GRANTED.

The motions to suppress statements made at Montgomery are DENIED.

Defendant Taft's request for return of the firearms seized in Montgomery is DENIED.

Defendant Taft's request for return of personal correspondence and documents seized from the Stowe residence is GRANTED.

Defendant Taft's motion:

1. For a *Franks* hearing is DENIED;
2. To bar introduction of evidence relating to plants destroyed by the Government is DENIED;
3. To sever is DENIED; and
4. To compel disclosure of *Brady* evidence is DENIED.

Defendant Whitaker's motion to bar introduction of evidence relative to plants destroyed by the Government is DENIED.

It is hereby ORDERED that the above entitled matter is scheduled as No. 2 for trial by jury on Tuesday, July 9, 1991, at 9:30 a.m. Counsel shall file any requests for voir dire of the jurors, requests to charge the jury and trial memoranda on or before July 1, 1991.

If there is a change of plea, it must be done on or before July 5, 1991.

All exhibits are to be marked prior to trial.

Dated at Burlington, in the District of Vermont, this 14 day of June, 1991.