# State of Vermont v. Charles Crannell

[750 A.2d 1002]

No. 97-086

Present: Dooley, Morse, Johnson and Skoglund, JJ., and Teachout, Supr. J., Specially Assigned

Opinion Filed January 28, 2000

Motion for Reargument Denied March 14, 2000

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Robert R. Bent* of *Zuccaro, Willis and Bent*, St. Johnsbury, *Robert Appel*, Defender General, and *William A. Nelson*, Appellate Attorney, Montpelier, and *Charles A. Crannell*, pro se, Jarratt, Virginia, for Defendant-Appellant.

**Johnson, J.** Defendant appeals from a conviction for first-degree murder. He claims that the trial court erred in failing to suppress evidence seized in a consent search after he had invoked his right to counsel and to remain silent. He also argues that the evidence should have been suppressed because the search warrant was based on privileged statements and because the police executed the warrant improperly. He challenges the admission of two statements he made and the testimony of his ex-wife concerning a prior crime as impermissible character evidence. In addition, he claims that the trial court improperly disregarded a pro se motion he filed, denied his motion for acquittal, and denied him a speedy trial. Lastly, he claims he was improperly permitted to waive an instruction on lesser-included offenses. We find no error in the trial court's rulings and affirm.

In the early hours of October 19, 1992, the fire department reported to the scene of a fire at John Kenworthy's house in Castleton, Vermont. While investigating the area, the body of John Kenworthy was discovered about twenty-five feet from the house, with his arms bound behind him and an oil-soaked shirt wrapped around one arm. He had been stabbed approximately sixty to seventy times, his left hand had been fractured, and he had been hit in the head with a blunt instrument like a hammer or baseball bat.

Police investigating the homicide learned that Kenworthy had been married to Sandra Crannell from 1980 to 1982. Sandra had recently been divorced from defendant, Charles Crannell. Defendant lived in Johnstown, Pennsylvania, and had been attempting to reconcile with Sandra. He drove a 1985 two-tone Corvette that several witnesses reported seeing in Castleton during the hours immediately before and after the murder. One witness saw the car as well as defendant and described defendant as wearing a "watch cap." Such a cap was discovered near the crime scene. Police learned from Sandra that she had obtained a restraining order to keep defendant away from her house and that he had threatened to beat up anyone she was dating. Sandra also told police that defendant refused to acknowledge the divorce and was depressed. Based on this and additional information,

the Vermont State Police coordinated their investigation with Pennsylvania State Police, and arrested defendant at his home in Johnstown on October 21, 1992.

After lengthy pretrial proceedings, a jury trial was held in October 1995. Defendant was convicted of the first-degree murder of John Kenworthy. After additional post-trial proceedings, defendant appealed. On appeal, defendant is represented by counsel and also filed a pro se brief. Some sections of the pro se brief repeat the arguments capably made by counsel, and others are inadequately briefed.[1] We therefore consider the seven issues raised in counsel's brief along with those issues that were adequately briefed by defendant.

Defendant, through counsel, argues that the trial court erred by: (1) failing to suppress evidence obtained pursuant to a consent search of his home and vehicles in Pennsylvania; (2) failing to suppress evidence obtained in violation of the "knock-and-announce" rule; (3) not suppressing evidence obtained pursuant to the search warrant because it included information subject to a marital privilege; (4) admitting evidence of a prior bad act and two statements related to prior bad acts; (5) declining to consider defendant's pro se motion of August 1995; (6) failing to grant defendant's motion for acquittal; and (7) failing to grant defendant's speedy-trial motion. Additionally, in his pro se brief defendant claims that the court erred by: (1) failing to suppress the fruits of the Pennsylvania search because police improperly elicited an incriminating response; (2) failing to suppress the fruits of the Pennsylvania search because the warrant application contained false and inaccurate information; (3) failing to suppress the fruits of the Pennsylvania search because the identifications supporting the warrant application were obtained by a suggestive procedure; (4) failing to excise all Sandra Crannell statements from the search warrant application because the marital privilege applied between August 1992 and 1995; (5) failing to grant defendant's motion for a new trial based on evidence that another person admitted to writing some letters; and (6) permitting him to waive an instruction on lesser-included offenses. We address each of these issues in turn.

---

[1] Defendant also filed a pro se reply brief, which was immediately withdrawn by counsel with client's permission. Although defendant has written a number of letters to this Court claiming he did not want to withdraw his brief, we consider strategic decisions the proper province of counsel. In addition, the arguments defendant claims he made in the reply brief have been made elsewhere and received due consideration.

## I. The Consent Search

Defendant first contends that his consent to search his pick-up truck on October 21, 1992, was obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Edwards v. Arizona*, 451 U.S. 477 (1981).[2] He claims that because he was asked to consent after having asked for counsel, the evidence seized should have been suppressed. Defendant separates the information on the consent to search form into two distinct statements: (1) consent to search and (2) an admission that he owned the pick-up truck. He argues, in essence, that *any* question asked after a defendant has invoked one of the *Miranda* rights is improper interrogation and that the request for consent to search violated his rights because: (1) it was interrogation, and (2) it elicited testimonial information that he owned the truck.

On October 21, 1992, two days after the murder, the Pennsylvania State Police, acting on information they had gathered, as well as information provided by the Vermont State Police, obtained a warrant to search defendant's Corvette and apartment in Johnstown, Pennsylvania. The trial court found the following facts. Ten or eleven Pennsylvania police officers arrived at defendant's residence at 9:25 p.m. on October 21. They announced their presence, waited briefly, and then entered the apartment. Defendant declined to accompany them while they searched. One of the officers read defendant his *Miranda* rights from a card. When asked if he understood those rights, defendant indicated that he did. Defendant was then asked if he wished to waive those rights; he indicated that he did not wish to waive his rights and asked to speak with an attorney. The Pennsylvania officers did not ask defendant questions after he invoked his right to counsel.

Vermont State Police officers Boutin and Yustin arrived at defendant's residence at about 11:00 p.m. Officer Boutin was advised that defendant had been informed of his *Miranda* rights and had invoked his right to counsel. Boutin was also told that the Pennsylvania officers had observed an awl in the back of defendant's pick-up truck but that the search warrant did not permit them to search the truck. Boutin then informed defendant who he was and why he was there, and told him that he wanted to search the pick-up truck. Defendant responded "to the effect that, if he did not agree to the search, the

---

[2] Defendant has not asserted rights under the Vermont Constitution; therefore we analyze his claim under federal standards only.

officers would simply obtain a search warrant in any event." Boutin answered that the police might or might not be able to get a warrant. Defendant then consented to having the truck searched, signing a consent form in the presence of several witnesses. The consent form as completed by defendant stated:

> I, Charles Crannell, have been requested by Gary Boutin of the VSP to give my consent for the police officer to search places, item(s) or vehicle(s) described above for the item(s) also described above. I have been told that I do not have to give my consent. I understand that I have the right to refuse, [sic] this request and that the police may not be able to conduct this search without a search warrant unless my written consent is given, none the less, I voluntarily give my written consent to the police to conduct this search. I'am [sic] the owner of the vehicle(s) to be searched.

Defendant initialed next to the line stating "I'am [sic] the owner of the vehicle(s) to be searched." Police searched the truck and seized the awl, which was later admitted into evidence at trial.

Defendant moved to suppress the fruits of the search before trial, arguing that the request for consent violated his rights to silence and assistance of counsel. The trial court denied the suppression motion, holding that the request was not custodial interrogation and that the consent given was not testimonial or communicative for purposes of the Fifth Amendment. Defendant appeals that denial. We review the trial court's decision to admit evidence for abuse of discretion. See *State v. Powers*, 163 Vt. 98, 100, 655 A.2d 712, 713 (1994).

Defendant's argument hinges upon the decision in *United States v. Taft*, 769 F. Supp. 1295 (D. Vt. 1991). There, the court held that it was impermissible to seek consent to a warrantless search after a suspect had asserted his right to counsel. See *id.* at 1305. While it is true that *Edwards* prohibits custodial interrogation once a request for counsel has been made, see 451 U.S. at 485, the United States Supreme Court has defined "interrogation" as behavior by police officers that "they should have known was reasonably likely to elicit an incriminating response." See *Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980). Therefore, the issue here is whether either the request for consent to search, or the question about ownership of the truck, was designed to elicit an incriminating response.

■ Defendant relies on the *Taft* decision in asserting that his consent to search was improperly obtained. This decision is in conflict

with the overwhelming weight of authority holding that requests for consent are permissible because they do not elicit an incriminating response. In fact, the *Taft* court contravened Second Circuit precedent, which holds that a request for consent to search does not violate Fifth Amendment rights. See, e.g., *United States v. Faruolo*, 506 F.2d 490, 495 (2d Cir. 1974) ("There is no possible violation of fifth amendment rights since the [defendant's] consent to search is not 'evidence of a testimonial or communicative nature.'" (citation omitted)). The federal courts of appeal agree that a defendant's consent to search is not an incriminating response and therefore a request for consent is not "interrogation" subject to limitation by *Edwards*. See *United States v. McClellan*, 165 F.3d 535, 544 (7th Cir. 1999); *United States v. Smith*, 3 F.3d 1088, 1098 (7th Cir. 1993) (collecting cases); see also *United States v. Hidalgo*, 7 F.3d 1566, 1568 (11th Cir. 1993); *United States v. Rodriguez-Garcia*, 983 F.2d 1563, 1568 (10th Cir. 1993); *Cody v. Solem*, 755 F.2d 1323, 1330 (8th Cir. 1985); H. Pizzetta & A. Gambhir, *Twenty-Fourth Annual Review of Criminal Procedure: Custodial Interrogations*, 83 Geo. L.J. 802 (1995) (collecting cases). We agree with the trial court that the request for consent to search did not violate *Edwards*.

Second, defendant claims that his consent to search contained a testimonial or communicative aspect about his ownership of the truck. Defendant argues that he was asked to acknowledge that he owned the truck, that this element of the consent was testimonial, and formed part of the basis to link the awl to him.

■ Assuming, without deciding, that acknowledging ownership of a vehicle through a consent to search form is testimonial information, we hold that it is not sufficiently testimonial to create a Fifth Amendment violation. The prohibition on compelling "testimonial" evidence is subject to a de minimis exception: the compelled act must be "sufficiently testimonial" to implicate the privilege against self-incrimination. See *Fisher v. United States*, 425 U.S. 391, 411 (1976). For example, although "[w]hen an accused is required to submit a handwriting exemplar he admits his ability to write and impliedly asserts that the exemplar is his writing," these acts are not "sufficiently testimonial" to invoke the Fifth Amendment. *Id.* According to the *Fisher* Court, where the relevant testimonial component is a "foregone conclusion," then the testimonial aspect of the act of production is not protected by the Fifth Amendment. *Id.* Here, the alleged testimonial value of an acknowledgment of ownership implicit or explicit in defendant's consent to search was not sufficiently

394

testimonial to distinguish this case from *Fisher*. Defendant's ownership of the truck was a foregone conclusion.

■ In the instant case, any acknowledgment of defendant's ownership in the consent to search was cumulative to properly admitted evidence. The defense itself elicited testimony from Sandra Crannell that defendant owned a pick-up truck with Vermont license plates before any of the State's witnesses addressed the issue. Where the connection between defendant and the pick-up truck was proven through proper means, the verdict is supported by properly admitted evidence, and no reversal is required.[3] See *State v. FitzGerald*, 165 Vt. 343, 346, 683 A.2d 10, 13-14 (1996) (even if error, where defendant's statement was cumulative to proper evidence, admission of statement is harmless).

## II. The "Knock-and-Announce" Rule

Defendant next argues that the Pennsylvania police failed to comply with the "knock-and-announce" rule. This rule is derived from the Fourth Amendment's requirement of reasonableness and mandates that officers must knock and announce their presence before entering a dwelling pursuant to a search warrant. See *Arkansas v. Wilson*, 514 U.S. 927, 936 (1995). The trial court heard defendant's pretrial motion to suppress and made the following findings of fact. Pennsylvania Officer Stephen and nine or ten other officers arrived at defendant's residence at 9:25 p.m. on October 21, 1992, with a search warrant. Officer Stephen was the lead officer. He knocked at the door to defendant's basement apartment and announced his name. He said he was with the state police and that he had a search warrant. Stephen then heard rustling noises and waited approximately ten seconds, then opened the unlocked door. It is therefore plain that the officers did knock and announce their authority and purpose. Defendant seems to object solely to the fact that Stephen did not wait until defendant opened the door.

Police officers are, of course, permitted to enter a dwelling to execute a warrant where they have announced their purpose and the

[3] In his pro se brief, defendant also argues that because the police had seen the awl in the back of the truck, they used the consent form, including the statement about ownership, to elicit the incriminating information that he owned the truck. The record is devoid of any indication that the police officers specifically asked defendant to complete that section of the form, and regardless of the sequence of events of October 21, 1992, defendant's ownership of the truck was indisputable and cumulative to evidence defendant elicited from Sandra.

occupants of the dwelling refuse them entry. Refusal may take many forms but certainly includes failure to respond to the knock-and-announce within a reasonable period of time. As many courts have found, a "reasonable time is ordinarily very brief." *United States v. James*, 528 F.2d 999, 1017 (5th Cir. 1976). Several courts have found that a delay of ten seconds or so may reasonably be interpreted by police officers as constructive refusal of entry. See *United States v. Knapp*, 1 F.3d 1026, 1031 (10th Cir. 1993) (ten- to twelve-second interval plausibly considered a constructive refusal); *United States v. Bonner*, 874 F.2d 822, 825 (D.C. Cir. 1989) (given small apartment and early evening hour, ten-second delay was "particularly probative of refusal").

In this case, in addition to hearing no verbal response from defendant, the police officers heard "rustling" noises and testified at trial that they feared evidence might be destroyed. As the United States Supreme Court acknowledged in *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997), the rule may be dispensed with where the police have a reasonable suspicion that delaying entry would allow the destruction of evidence. Although defendant argues that he could not easily destroy or dispose of the physical evidence such as tools, his hair, or his car, we note that the officers heard noises indicating an occupant was near the door yet had not responded. Those noises might signal some kind of tampering with or destruction of evidence such as clothing or papers.

■ Further, we have previously held that where "[t]he officers . . . complied with the knock and announce rule . . . we fail to see why we should go further than the rule requires." *State v. Meyer*, 167 Vt. 608, 609, 708 A.2d 1343, 1345 (1998) (mem.) (holding search proper where police entered unoccupied home after knocking and announcing). In the circumstances of this case, where the police knocked and announced their presence, defendant did not verbally respond, and police officers heard rustling noises, we cannot say that the entry was unjustified or unreasonable.

### III. Statements Subject to Marital Privilege

Defendant next claims that the search warrant obtained by the Pennsylvania State Police was based in part on statements made to the Vermont State Police by Sandra Crannell that should have been excised because they were subject to a marital privilege. He relies on V.R.E. 504, which provides that a person has a privilege to prevent

his spouse from disclosing confidential communications made while they were lawfully married. He further claims that once those statements are excised, the affidavit fails to provide probable cause for a warrant to issue.

Defendant was married to Sandra from October 18, 1990 to August 11, 1992 (the expiration of the nisi period for their no-fault divorce). Defendant identifies five of Sandra's statements contained in the search warrant application that he claims violated the marital privilege: (1) in late August 1992, defendant refused to acknowledge the divorce and threatened to beat up anyone who was dating her; (2) before the marriage, defendant told her he had blown up a car with a bomb and was apprehended only because he failed to destroy evidence; (3) before the marriage, defendant told her about methods for killing someone and for concealing the crime; (4) defendant, when asked by Sandra if he had ever killed anyone, answered "there are just some things you never talk about"; and (5) defendant had written to Sandra in August 1992 saying he was depressed and that she was his whole life.

Defendant made statement 1 to Sandra in a telephone call during the week of August 21, 1992, after the divorce became final on August 11, 1992. Defendant points to the fact that he attacked the divorce decree in August 1992 and that in September 1993 that decree was set aside. (The Crannells were later divorced a second time.) He claims that the set-aside divorce decree of August 1992 did not end their marriage and therefore his statements were made during a lawful marriage. This argument would affect only the admission of statement 1, made after August 11, 1992. Since this information was also contained in Sandra's application for the restraining order and was therefore public record, we cannot see how the statement is privileged. We think it determinative that at the time the statement was made, the divorce, which defendant had initiated and sought, had become final by order of the family court and therefore any reliance on a marital privilege was patently inappropriate. See Reporter's Notes, V.R.E. 504 (rule encourages confidential communications made "in reliance on the existence of the [marital] relationship"). Therefore, no marital privilege applies. Thus, no excision was needed, and the statement properly formed part of the probable cause for the search warrant.

Statements 2 and 3 were found by the trial court to have been made to Sandra before the marriage. Therefore, these statements were not

subject to a marital privilege and properly formed part of the basis for probable cause.

Because Sandra testified that she could not remember whether statement 5 was made before or after the divorce became final, we assume for purposes of our analysis that statements 4 and 5 were made during the marriage and should therefore have been excised from the search warrant.[4] Exclusion of these statements, however, does not automatically render the probable cause finding improper.[5] See *State v. Morris*, 165 Vt. 111, 129, 680 A.2d 90, 102 (1996) (where some evidence in affidavit must be expunged, court may determine whether remaining information established probable cause for issuance of warrant).

Probable cause to search exists when the information in an application for a warrant leads a judicial officer to "reasonably conclude that a crime had been committed and that evidence of the crime will be found in the place to be searched." *Id.* In this case, a murder had plainly been committed, and several witnesses saw defendant's car in the area before and after the murder. One witness described defendant as wearing a watch cap, and such a cap had been found near the crime scene. Furthermore, defendant's conviction for bombing a car in Florida was a matter of public record, as well as the restraining order obtained by Sandra because she feared he would hurt her or someone she dated. Even absent Sandra's statements to the police, the nexus between defendant and the crime was well-supported. Given that statements 1, 2 and 3 were properly included in the affidavit, the affidavit established probable cause without the two statements possibly made during the marriage.[6] Thus, any error in including those statements was harmless. See *State v. Wright*, 154 Vt. 512, 531, 581 A.2d 720, 731 (1989) (assuming admission of statements

---

[4] We further assume that these two statements were confidential, as defined by Rule 504, and that the privilege was never waived, although defendant has not demonstrated this in his briefs.

[5] Indeed, a number of states have declined to interpret their marital-privilege statutes to apply to probable cause determinations. See generally *State v. Farber*, 314 N.W.2d 365, 367 (Iowa 1982); *People v. Kemp*, 399 N.Y.S.2d 879, 883 (App. Div. 1977). As the Reporter's Notes to V.R.E. 504 reveal, however, Rule 504 is based on 12 V.S.A. § 1605, which is a unique Vermont provision, and therefore we do not decide at this time whether a more narrow reading of the privilege is appropriate.

[6] Defendant also challenges the trial court's refusal to excise certain statements he alleges were false because, as the trial court decided, defendant had failed to show that the false statements were made knowingly or with reckless disregard for the truth. This claim is inadequately briefed, and therefore we decline to address the issue. See V.R.A.P. 28(a)(4); *Johnson v. Johnson*, 158 Vt. 160, 164 n.*, 605 A.2d 857, 859 n.* (1992).

violated marital privilege, error was harmless as outcome of trial would have been same).

## IV. Suggestive Identification Procedures

Defendant's pro se brief makes a number of arguments, which boil down to claims that the Vermont State Police used improperly suggestive techniques when asking witnesses to identify defendant and defendant's Corvette from photographs. Defendant points out some inconsistencies among statements made by various witnesses and asserts that some witnesses fail to state some information he thinks important. A number of these arguments were not raised before the trial court and therefore have been waived.

Specifically, defendant first takes issue with an alleged error in the search warrant application, which revealed that witness Sam McCormick stated he pumped gas into a blue Corvette on October 17, 1992.[7] Defendant points out that McCormick's written statement does not mention the color blue. This claim was not raised below and therefore has been waived. See *Morais v. Yee*, 162 Vt. 366, 372, 648 A.2d 405, 410 (1994).

■ Defendant also argues that McCormick's identification of defendant's Corvette was the result of an impermissibly suggestive identification procedure. The crux of his claim is that the police should have shown witnesses pictures of several Corvettes of different colors. We can find no support for his claim, either within Vermont or elsewhere. Courts that have considered such a claim have rejected it. See *Commonwealth v. Simmons*, 417 N.E.2d 1193, 1196 (Mass. 1981) (danger of fundamental unfairness greater with personal identification, since identification of property is only indirect proof of guilt and tangible objects are rarely unique); *Commonwealth v. Carter*, 414 A.2d 369, 373 (Pa. Super. Ct. 1979) (identification of real evidence does not carry "enormous probative weight" of personal identification, and therefore does not require same precautions; any suggestiveness goes to weight of evidence, not admissibility); *Inge v. Commonwealth*, 228 S.E.2d 563, 567 (Va. 1976) (one-on-one identification of a vehicle presents questions of weight and credibility, not an admissibility

---

[7] Defendant also argues that McCormick failed to say that the numbers on the Corvette's license plate were green and failed to say that the Corvette's gas tank access is behind the license plate. Neither of these facts were included in the warrant application; defendant's claim seems to be that their absence renders the application insufficient. We cannot agree.

question of constitutional dimensions), *upheld in pertinent part by Inge v. Procunier*, 758 F.2d 1010 (4th Cir. 1985). Therefore, we decline to create a rule requiring police to provide a photo array of an object such as a car.

Next, defendant argues that the identifications of witnesses John Alexander and Michael Bruno should have been excised because the tinted windows of defendant's Corvette would have prevented them from seeing inside the car. Alexander saw the Corvette at midnight, pulled off the road near Kenworthy's home. Bruno saw the Corvette at about 3:00 a.m., being driven away from Kenworthy's area at high speed. This issue was not raised below and is waived; additionally, defendant failed to assert that the false statement was made knowingly, intentionally or with reckless disregard for the truth. See *State v. Demers*, 167 Vt. 349, 353, 707 A.2d 276, 278 (1997). Defendant further claims that Alexander's and Bruno's identification of defendant's Corvette was prompted by the suggestive procedure of showing each witness a single picture of defendant's car. This claim is meritless, as explained above.

■ Finally, defendant takes issue with the use of statements by witness Timothy Matthews in the warrant application. Matthews saw a man and a car in a parking lot near Kenworthy's home. Matthews described the man as wearing a long coat, boots and a watch cap. He described the car as a light-blue Corvette with Florida license plates, bearing the number ZAZJ29.[8] Defendant argues that Matthews did not know whether the man and the car were connected and therefore did not establish probable cause. A finding of probable cause is based on the totality of the circumstances, not on a single piece of evidence or a single witness's observations. See *id.* at 355, 707 A.2d at 279. Matthews's observations were but a part of the evidence provided to establish probable cause and, taken in conjunction with the other sightings of the Corvette as well as a man matching defendant's description, the application did show probable cause.

## V. Evidence of Prior Bad Acts

Defendant claims that three pieces of evidence admitted at trial were used as impermissible character evidence. He relies on V.R.E. 404(b), which provides that "[e]vidence of other crimes, wrongs, or

---

[8] Matthews later corrected his statement, identifying the license number as ZAZ32J, which was defendant's Florida license plate for the Corvette.

acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Defendant's argument points to two statements he made that were admitted through the testimony of his ex-wife, Sandra, and the testimony of a former co-worker, James Ramosca. Defendant characterizes the statements as "acts" that were used by the State as character evidence. In addition, defendant points to Sandra's testimony about a car-bombing defendant claimed to have committed. We address the statements first, which do not require Rule 404 analysis, and then turn to the bona fide "bad act" evidence admitted, the testimony about the car-bombing.

## A. The "Hit Man" Statement

At trial, the State introduced evidence that defendant had written a number of letters to Sandra before, during, and after their marriage. The State used Sandra to authenticate a number of handwritten letters by identifying defendant's handwriting and also identifying specific letters she had received. Dozens of handwritten letters were admitted into evidence over the two-day period of Sandra's testimony. They were not published to the jury at the time; the jury was permitted to review them during deliberations.

One of the letters written to Sandra before the marriage and admitted into evidence contained the following statement: "my greed for the all mighty dollar might have led me down the path of a professional hit man. I was on my way." The context of the statement was defendant's assertion that God, through Sandra, had intervened in his life and kept him from that path. This statement was never read aloud to the jury; no one ever quoted it. Indeed, it was buried in the many letters admitted and would have required the jury to pick out that single statement and seize upon it. While the State referred to several letters in its closing argument, it did not refer to this letter.

Defendant claims that the admission of the "hit man" letter caused irremediable prejudice and forms ground for reversal. Defendant claims that this statement, along with the ice-pick statement discussed below, were "spun together to portray" defendant as a professional killer.

We will reverse a trial court's decision to admit evidence only if the court withheld or abused its discretion. See *State v. Powers*, 163 Vt. at 99-100, 655 A.2d at 713. The statement at issue is not an "act" within the usual meaning of Rule 404; it is merely a statement defendant wrote. The statement does not reveal any prior misconduct such as

Rule 404 forbids. It reflects only defendant's state of mind and not any crime or wrong committed by defendant in the past. Defendant was commenting on what might have been, and attributing to Sandra the power to help him. Therefore, Rule 404 does not apply. See *United States v. Mixon*, 1999 WL 436269 at *9 (10th Cir. 1999) (Rule 404 argument was "off the mark" because statement that witness thought defendant was selling drugs again was not bad act evidence, but rather testimony of her state of mind); *Hicks v. State*, 690 N.E.2d 215, 221 n.11 (Ind. 1997) (where defendant said he wanted and wished victim would die, those statements were admissible because "they are not evidence of 'other crimes, wrongs, or acts'"); *Massey v. State*, 933 S.W.2d 141, 154 (Tex. Crim. App. 1996) (where testimony concerned defendant's thoughts rather than conduct, Rule 404 was not implicated); *Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993) (inchoate thoughts about desire to kidnap and kill someone were not excludable under Rule 404(b)).

■ Therefore, the test of admissibility is simply whether the evidence was relevant and not unduly prejudicial. See V.R.E. 402 and 403. Overall, defendant's letters to Sandra were relevant because they suggested a motive for the killing, by illustrating defendant's desire to reconcile with Sandra and his conviction that they belonged together. Given that the statement about potentially becoming "a hit man" was buried in one of many letters and was not emphasized in any way to the jury, we cannot conclude that its admission was unduly prejudicial.

## B. The "Ice-pick" Statement

James Ramosca, a former co-worker of defendant's, testified at trial about statements that defendant had made to him. In 1990 or 1991, Ramosca testified, defendant had said "he would not hesitate to take someone out if necessary" and that he would "take the ice pick, stick it through someone's brain." This was the full extent of the "ice-pick" comment. The State did not mention Ramosca or his testimony in its closing argument. As with the "hit-man" letter, the statement at issue is not an "act" introduced to show the character of defendant in violation of Rule 404; it is simply a statement that defendant made. The statement does not reveal any prior misconduct; it merely reflects defendant's state of mind. Therefore, Rule 404 does not apply and the trial court erred in analyzing the "ice-pick" comment under the stringent requirements of whether the prior

comment provided identity evidence or demonstrated a "signature" crime. The test for admissibility is whether the evidence was relevant and not unduly prejudicial. See V.R.E. 402 & 403.

The State's theory of the case was that defendant was desperate to reconcile with Sandra and jealous of Kenworthy, who had been spending time with her. The State put on evidence that showed the numerous stab wounds inflicted on Kenworthy could have been caused by a slender, sharp, rounded weapon, like an ice-pick or an awl, such as was found in defendant's truck. The evidence may have shown that the murder was first attempted with the quick method of a sharp, pointed object into the brain, consistent with the small stab wounds to the skull. This method plainly did not succeed, and the evidence was consistent with an interpretation that the murderer had become enraged and vindictive, explaining the multiple stab wounds and blunt-object trauma to the head.

Ramosca's testimony that defendant would not hesitate to take someone out with an ice-pick to the brain was relevant as tending to show a familiarity with a tool possibly used in the murder, although the style of the murder was not identical to that defendant described to Ramosca. The fact that the murder was not accomplished exactly as defendant suggested does not make irrelevant defendant's professed willingness to use a tool such as an ice-pick to kill someone. As this evidence was relevant, it was properly admitted unless it was unduly prejudicial.

■ We have held that evidence is unfairly prejudicial if its primary purpose is to appeal to the jury's sympathies, arouse a sense of horror, provoke its instinct to punish, or cause the jury to base its decision on something other than the established propositions of the case. See *State v. Little*, 167 Vt. 577, 579, 705 A.2d 177, 180 (1997) (mem.). This evidence was not explicit or graphic; it could not be more disturbing than the photographs of wounds caused by an instrument like an ice-pick, which were shown to the jury in the autopsy photos. This evidence does not "rise to the level of provoking a jury to return a verdict based on its emotional reaction." *Id.* Thus, the trial court's admission of the statement was not an abuse of discretion.

■ Ramosca also testified that defendant had bragged to him about being a hit man. Although this testimony was immediately struck and the court gave a curative instruction, defendant claims in his pro se brief that this statement requires a new trial. This Court has long upheld the efficacy of curative instructions. See *State v.*

*LaBounty*, 168 Vt. 129, 140, 716 A.2d 1, 8 (1998). In *LaBounty*, as in this case, the objectionable comment was brief and the court's response was immediate and unequivocal. See *id*. Therefore, we find no abuse of discretion in the trial court's determination that defendant was not unduly prejudiced by the stricken evidence.

### C. Sandra Crannell's Testimony About the Car-Bombing

Sandra Crannell testified on the second and third days of trial. Ultimately, she was permitted to testify about her belief that defendant had bombed a truck in Florida some time before she met him. The trial court originally excluded this evidence but then ruled it admissible on rebuttal. This testimony must be analyzed under Rule 404(b), as the bombing is a bona fide "bad act." Defendant argues that this testimony should have been excluded under Rule 404(b) as evidence of a prior bad act introduced solely to show that defendant acted in conformity with a criminal character, and that he did not invite the evidence by cross-examination. Defendant further argues that the introduction of this evidence was so unduly prejudicial that reversal is the only remedy.

The testimony must be considered in its full context to understand the potential influence it had on the jury. Sandra testified that on August 21, 1992, defendant called her from Pennsylvania and said he was going to come to her house in Vermont. She told him she would not let him in, but he insisted he was going to see her. After receiving this telephone call, she sought a restraining order. John Kenworthy went with her and helped her request the order. She testified that she was scared, both for herself and John, because defendant had threatened to "kick [the] ass of anybody that [she] went with or came around [her] place." She further testified that defendant came to her house on August 22, the morning after his telephone call. He came to the door and pleaded with her to let him in. She refused his repeated pleas, and then he went to the back of his pick-up truck. She suspected he was getting tools from the truck because he worked as a telephone lineman. She called the state police and asked them to come to her assistance, and then the telephone line went dead. When the police arrived, they found defendant still outside and told him he had to leave the property as Sandra had obtained a restraining order. They may have instructed him to reconnect her telephone line because defendant called her on the telephone ten minutes later. Defendant was angry because Sandra had gotten a restraining order.

Defense counsel vigorously cross-examined Sandra, asking first whether defendant had been affectionate toward her. Counsel then

asked a series of questions asserting that defendant had never assaulted her before, during, or after the marriage. Defense counsel also cross-examined Sandra about the letters defendant had sent, asking, "they weren't threatening letters, were they?" Then defense counsel asked about the August 22 incident, insisting defendant "didn't try to come in, break in, nothing like that, correct?" Counsel continued in the same vein: "Didn't assault you, didn't threaten you, none of that?" Sandra agreed with his questions. Then defense counsel asked whether she remembered that defendant had called to apologize. Sandra answered, "He didn't apologize . . . . He was very angry with me."

A few moments later defense counsel returned to the same theme, asking "[I]n that conversation [when defendant threatened to beat people up], he didn't threaten to kill anybody, did he?" Sandra said she did not interpret it that way. Then defense counsel asked whether the "I'm going to kick their ass" comment could have been expressed in "a moment of anger? [or a] Moment of dissatisfaction?" Sandra replied, "I thought it was very unfair of him to feel that way."

In chambers, the state's attorney argued that the cross-examination had painted Sandra as overreacting and/or lying about her fear of defendant and asked permission to rehabilitate her by allowing her to testify about her knowledge of his involvement in a car-bombing. Defense counsel argued that the information was too prejudicial and that the cross-examination had not opened the door to questions of Sandra being unreasonably afraid. The court concluded that although the evidence had originally been excluded as unduly prejudicial, the cross-examination by defendant had created an incomplete picture that the State was entitled to complete. The court noted the series of questions asked by defense counsel about her fear and defendant's threats. Therefore, the court admitted the evidence for rehabilitative purposes "to give a complete picture of what her state of mind was and what the reasonableness of her fear was." The court limited the information to what Sandra had learned from defendant and barred any information about whether the bombing actually happened or whether defendant was convicted.

Sandra testified that she was frightened of defendant because he had told her that he had been asked to bomb a truck for $5,000 and had done it. The court immediately instructed the jury that the evidence had been introduced only for their consideration of whether Sandra reasonably feared defendant when she obtained the restraining order. The court further instructed "you may not consider it as

tending to show in any way the defendant's guilt for the offense for which he is now on trial."

After the conclusion of the trial, defendant moved for a new trial based on the allegedly improper admission of Sandra's testimony, as well as other errors. In its order denying a new trial, the trial court noted that evidence of a prior bad act may be admitted, as it was in this case, in order to rehabilitate a witness. The court went on to explain:

> In this case, Sandra Crannell was a critical witness. Her testimony presented evidence for the motive of the crime. Through Sandra Crannell, the State sought to prove that the Defendant was obsessed with continuing his relationship with her and killed John Kenworthy because he believed Mr. Kenworthy stood in the way of a reconciliation. Sandra Crannell was the only witness to the Defendant's behavior toward her and her testimony was important. The Defense's cross-examination painted an incomplete picture of the Crannell[s'] relationship by making Sandra Crannell appear over-reactive and untrustworthy.

In reviewing the trial court's admission of evidence under Rule 404, we must decide whether the admitted evidence satisfied Rule 403, that is, was relevant and material, and if so, whether the introduction of the evidence was so prejudicial to defendant as to outweigh its probative value. See *State v. Bruyette*, 158 Vt. 21, 31-32, 604 A.2d 1270, 1275 (1992). Although defendant claims that Rule 404 acts as an absolute bar to any evidence of prior bad acts, we have noted that "[t]he rule recognizes that evidence that may be inadmissible for the [purpose of showing propensity] may be admitted for other permissible purposes." *State v. Recor*, 150 Vt. 40, 44, 549 A.2d 1382, 1386 (1988).

Defendant failed to object to Sandra's testimony about obtaining the restraining order. In the context of the actual trial, defendant apparently did not consider the evidence so prejudicial that it warranted an objection. Therefore, we cannot accept defendant's argument that the prosecution opened a door by suggesting that defendant assaulted Sandra. Rather, it was the defense cross-examination attacking Sandra's testimony about defendant's frightening jealousy that opened the door. Thus, the State appropriately requested permission to complete the picture by eliciting Sandra's basis for fearing defendant.

In admitting the evidence, the trial court relied on *Recor*, 150 Vt. at 44, 549 A.2d at 1386. There, a witness alleging that her step-father had sexually assaulted her had been instructed not to mention a previous incident of alleged assault. On cross-examination, the defense suggested that the witness was biased against the defendant and had been for some time. Due to that attack, the court permitted the State to elicit information about the earlier assault to explain that the witness's bias was reasonable. See *id.* at 45, 549 A.2d at 1386. The witness then testified that she had hated the defendant for several years because he had sexually assaulted her in 1982. There, as here, "[d]efense counsel sought to impeach the credibility of the . . . witness by painting an incomplete picture of unwarranted bias. The State's response was to complete this picture with appropriate detail. The purpose of the witness'[s] testimony on redirect, thus, was not to establish the character of the defendant . . . ." *Id.* at 44, 549 A.2d at 1386. See also *People v. Greenhagen*, 433 N.Y.S.2d 683, 685 (App. Div. 1980) (affirming admission of witness's testimony that defendant tried to molest her as rehabilitating her credibility after cross-examination had accused her of bias).

The facts in this case are quite similar to those in *Recor*. Sandra had been instructed not to mention the Florida bombing and had offered other reasons for her fear of defendant's jealousy. Defense counsel attacked her on cross-examination, repeatedly asking her whether defendant had assaulted her, whether he had threatened other people, whether he had broken into her house. The court, able to gauge the impact of this questioning at the time, felt that the defense had depicted Sandra as "over-reactive and untrustworthy." For the limited purpose of responding to the attack on her credibility, the court allowed her to testify that she feared defendant because he had told her he had bombed a truck in Florida. The court then instructed the jury not to consider the evidence as showing defendant's character or propensity to commit the crime at issue. As in *Recor*, the State's response was necessary to complete the picture painted by the defense.

█ Other courts have also held bad-act evidence to be admissible for rehabilitative purposes. See *State v. Harris*, 560 N.W.2d 672, 677 (Minn. 1997); *State v. McNeill*, 700 N.E.2d 596, 603 (Ohio 1998). Others have assumed that it would be admissible in such circumstances. See *State v. Montgomery*, 740 A.2d 625, 627 (N.H. 1999) ("Had the defendant, for example, 'opened the door' by directly challenging his daughters' inability to recall particular detail about

the charged sexual assaults, the State may well have been able to use the uncharged sexual assaults to rehabilitate its witnesses."). In this case, the witness whose credibility was challenged testified about crucial facts suggesting a motive for the crime. The testimony was carefully limited in scope and immediately followed by a limiting instruction. We cannot say that the trial court abused its discretion in admitting the evidence for rehabilitation purposes.

## VI. Defendant's Pro Se Motion of August 1995

■ Defendant next claims that the trial court failed to exercise its discretion by refusing to consider a motion filed by defendant pro se. As we have recognized, "'[a] criminal defendant does not have an absolute right to both self-representation *and* the assistance of counsel.'" *State v. Sims*, 158 Vt. 173, 185, 608 A.2d 1149, 1156 (1991) (emphasis in original) (quoting *United States v. Halbert*, 640 F.2d 1000, 1009 (9th Cir. 1981)). Defendant concedes, however, that the trial court has complete discretion in managing hybrid representation. As a court has the discretionary right to deny hybrid representation, it has the corollary discretionary right to control any hybrid representation it does permit. *Id.* (citing *United States v. Nivica*, 887 F.2d 1110, 1121 (1st Cir. 1989)). The record reveals that the court considered the fact that hybrid representation is generally not allowed, and considered the specific circumstances in this case. The court noted: "[h]ere, the Defendant is represented by counsel. He has not waived his right to counsel nor has he requested to proceed pro se. He may not therefore initiate proceedings without following standard court procedure. In this case, court procedure mandates that all motions and pleadings be submitted by his attorney." The trial court weighed the issues at stake in hybrid representation and made a decision based on the specific facts of the case. There was no abuse or withholding of discretion.

## VII. Motion for Acquittal

■ Defendant claims on appeal that his motion for acquittal was improperly denied. Although he moved for a judgment of acquittal at the end of the State's case, he did not renew this motion at the close of the evidence, thereby waiving his objection. See V.R.Cr.P. 29(a); Reporter's Notes to Rule 29 (failure to move for acquittal or to renew motion at close of all evidence "forecloses appellate consideration of all issues of sufficiency of the evidence"). Nor did he file a post-verdict

motion for acquittal within ten days of the jury's verdict. See V.R.Cr.P. 29(c); *State v. Brooks*, 163 Vt. 245, 254, 658 A.2d 22, 28-29 (1995) (holding that where defendant moved for acquittal within ten days of verdict, issue was preserved for appellate review). Because defendant here neither renewed his Rule 29(a) motion at the close of all the evidence nor made a Rule 29(c) motion within ten days of the jury's discharge, his objection is not preserved for appellate review.

## VIII. Speedy Trial Claim

■ Defendant also claims that his right to a speedy trial was violated by his thirty-four month incarceration between arrest and trial. The four factors weighed in assessing a speedy trial claim are: "the length of the delay, the reason for the delay, defendant's efforts at obtaining a speedy trial, and the prejudice to the defendant." *State v. Turgeon*, 165 Vt. 28, 35, 676 A.2d 339, 343 (1996) (citations omitted). "Of these factors, prejudice is the most important. Where there is no prejudice to the defense at trial, a speedy-trial claim cannot prevail." *Id.* The record here reveals that the majority of the delay was caused by defendant. Defendant twice substituted counsel, and each new attorney required several weeks or months to become familiar with the complex record. Defendant filed dozens of pretrial motions; on August 1, 1994, alone, he filed seven motions that took months to resolve. He requested numerous continuances. Last but not least, defendant obstructed the State's efforts to obtain both handwriting exemplars and hair samples from him, going so far as to dye his hair while in prison, which forced the State to bring contempt actions against him. Although not every month of delay was caused by defendant, he alleges no prejudice other than being incarcerated before trial. To date, we have not recognized pretrial incarceration alone as prejudice. See *State v. Keith*, 160 Vt. 257, 269, 628 A.2d 1247, 1254 (1993) ("[W]e have denied lack-of-speedy-trial claims despite the fact that the defendant was jailed for a significant period before trial."). We decline to do so based on these facts.

## IX. Instruction on Lesser-Included Offenses

Finally, defendant claims in his pro se brief that the trial court erred in permitting him to waive a jury instruction on lesser-included offenses. The record shows that the court asked defendant whether he had an opportunity to discuss the lesser-included offenses with his attorneys, whether he understood that the lesser-included offenses

could conceivably be second-degree murder and manslaughter, whether he desired to forego a charge of lesser-included offenses and simply give the charge as first-degree murder, whether he had sufficient opportunity to freely and fairly discuss the issue with his attorneys, whether he was satisfied with the advice he received, and whether his choice was a free and voluntary one. Defendant answered all of these questions in the affirmative. The court additionally asked the defendant whether anyone had exercised undue influence in connection with the waiver of lesser-included offenses and whether he had taken any medication or other substance that would prevent him from understanding the advice given. Defendant answered these questions in the negative.

We recognize that "it may be a valid defense strategy for defendant to forgo an instruction on manslaughter in a murder case, despite that the facts may warrant its inclusion." *In re Trombly*, 160 Vt. 215, 219, 627 A.2d 855, 857 (1993). We also recognize that "where the omission is part of trial strategy and the defendant does not request such charge or object to its omission, the court need not include the charge on its own volition." *Id.* Here, the court discussed the issue of waiving the lesser-included offenses instruction with defendant and gave defendant ample opportunity to forego such waiver. The record shows that defendant's decision to waive the instruction on lesser-included offenses was made knowingly, voluntarily, and following sufficient time for discussion with counsel. Based on the facts, the trial court did not abuse its discretion in allowing defendant to waive the jury instruction on lesser-included offenses.

*Affirmed.*